Good afternoon, Your Honor. Devon Burstein on behalf of Mr. Adams. Before we begin, I was hoping the Court could perhaps give us some guidance on the manner in which it wanted to hear argument because there's no real overlap between the two cases. Right. Well, we're not going to give you... I thought that's something for Council to work out in advance as to how you want to allocate. So do you have a proposal? Yes, Your Honor. We were going to each take 10 minutes. I do know if the Court wanted to hear one first, we'll just go in succession. All right. And we do know that there are overlapping issues. Do you want to reserve each of you two minutes for rebuttal or one minute for rebuttal? Two minutes, Your Honor. Two minutes. Two minutes each, yes. So what we'll do, just to make it clear, is we'll have eight minutes on the clock for each of them for their primary argument, and then when rebuttal comes, we'll assume that they will have used only their eight minutes. And then we also tell you that because there are overlapping issues, as you know, to the extent they've been fully covered, there's no reason to repeat them. That's at no disadvantage to your client to not repeat those arguments. So we'll proceed. We'll start with Mr. Adams. Thank you, Your Honor. This is a case about an instructional error that deprived Mr. Adams of his only viable defense on count three. First, the District Court plainly erred in failing to give model instruction 8.5 on self-defense. Second, or in the alternative, trial counsel was constitutionally ineffective for failing to request the instruction. For either or both reasons, Mr. Adams' conviction cannot stand. Beginning with the District Court's plain error in failing to give instruction 8.5, Your Honors, the law is clear. To quote Sanchez Lima, a defendant is entitled to a jury instructions on the theory of self-defense provided that there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility. Now, consistent with that principle, in the context of assault on a federal officer, this Court's model instruction 8.4 specifically tells District Judges, quote, if the defendant denies knowledge that the instruction 8.5 should be used. Now, that is precisely the situation here. Although Mr. Adams didn't use any talismanic phrasing or particular buzzwords, his testimony established the requisite factual predicate. And under Escobar de Bright, his testimony alone was We think the key testimony in our briefs, ER 957, 959, 960, I won't read to the Court unless there's particular questions, but on both direct and cross-examination, he lays out a factual predicate that is essentially, I got caught up in a melee, I got knocked to the ground, I'm in a maximum security prison, he says repeatedly that he was startled, and he just reacted. That's what he said, he just reacted. It's a maximum security prison, there are assaults all the time, and I just reacted. I didn't know who I was punching because I was blinded by pepper spray. That is the essence of self-defense. I was acting to protect myself in a very dangerous situation. We think it's important that we He's saying, I don't know who I was hitting. And you've got a charge about he has to know he's hitting a federal officer, right? Well, under FIOLA, he doesn't have to intend to strike a federal officer. That's the problem. And that's why the lack of the jury instruction destroys his ability to defend himself. The lack, it's 8.5, not 8.4. That tells him if he has to know it's the instruction. If we look at 8.4, these are the elements. First, the defendant, forcibly assaulted, and then brackets, the name of the federal officer. Second, the defendant did so well, this would be years later in this case, was engaged or unaccounted as official duties. Third, the defendant, you inflicted violent injury. So nowhere in that instruction does he have to know it's a federal officer. That's why the commentary to 8.4 says, when he says he's not sure who it is or he doesn't know it's a federal officer, you have to give 8.5. So I guess the direct answer to Your Honor's question is no, the jury wasn't instructed that he had to know it was a federal officer. Well, it just seems to me that this is a little bit different than Bayer in terms of how the testimony plays out, because he's basically describing a situation that, you know, you sit in there, you never know what's going to happen, it's penitentiary, and somebody grabs you by the back and you don't know what's happening. So you take all of that and you say, well, where is the kernel of self-defense that makes the trial judge sit up and say, even though the counsel didn't say self-defense, and even though this doesn't say self-defense, this testimony doesn't suggest he was protecting himself, how is it the trial judge is supposed to divine this and be required to give a self-defense instruction? Well, we believe, Your Honor, respectfully, the factual predicate is there, and it's the factual predicate, and I can read a little bit of that, but it's the factual predicate combined with the specific instruction in 8.4 to give the 8.5 instruction. So if we look at ER 959, this is on direct examination, and his lawyer, Mr. Adams' lawyer is saying, I saw you swinging and punching, is that correct? And Mr. Adams candidly admits yes. What is going on in your mind at the time you were doing that? Like I said, I was confused as to what was going on, I was startled at first, you know what I mean? And like I said, it's prison, that's it, it's just reaction. Okay, at that point in time that you went down on the ground, did you at some point thereafter suffer the effects of pepper spray? Yes. And then he goes on to say it was immediately. And tell me what it felt like. He said it burned, it was blinding, it was hard to breathe. Were you able to see at that point? No. And isn't it true that thereafter you threw punches? Yes. Okay, and who were you punching at? Honestly, I wasn't too sure who exactly. Why weren't you too sure? Because I was sprayed and I couldn't really see. So our position is twofold based on that testimony, as well as all the other testimony we quote at length in the reply brief. He's twofold. The first point, Your Honor, is the district court should have been unnoticed from that. But let's just say the court just flatly disagrees and says that's not quite enough. He didn't say, I'm not sure why it wouldn't be quite enough, but let's just say that's the hypothetical. Then we're firmly, firmly, firmly into ineffective assistance of counsel. And I know very well. You know the rule and why we don't do ineffective assistance of counsel on appeal, because I can imagine the lawyer saying, blah, blah, blah, blah, blah. And I don't know what that's going to be. But that's the problem, Your Honor. And that's exactly the point I was going to make. That is a great rule. But this court has plenty of precedent saying, unless it's a rare situation where there is no blah, blah, blah, blah, blah. We can't imagine what the lawyer would say because there is no viable. We can't even. Well, just a second. You have a fellow who's chasing the officer down the hall. That's what the videotape shows, right? So I think this lawyer was thinking he could be convicted of a lot more things than assault. And that's what he focused on. And that's what I imagine you might hear from the lawyer if we had an inoffensive assistance of counsel hearing. And, you know, so that's why it would be a little tough to go there in this case. I think it would be hard. I mean, the lawyer would do exactly as Judge Rustani says. He said, look, this guy was facing a couple of really huge charges. And I'm making a calculated judgment about how to present it. And I don't hear self-defense. But even if I did, this is how I'm presenting it. So we don't know what that is. And I'm not sure this is the case we want to go out on a limb and say it's the extraordinary case. But we hear your point. We hear your point. You could imagine the prosecutor saying, well, this is a joke, self-defense. He chased the guy down the hall. And then perhaps throwing doubt or getting rid of doubt about everything and getting the convict and ending up in a worse place. I can see what the lawyer might have been thinking. Right. So we'll now hear from Wait, wait, Judge McCann. Yes, we're going to switch now to Mr. Motis' counsel. Wait, Judge McCann. Oh, yes. I'm sorry. Judge Gould had a question. I was talking to him. I'm going to interject a question for Mr. Burstein. My question is, is there any practical reason why your client did not make his ineffective assistance counsel argument through the habeas process that we have evidence to consider? Yes, Your Honor. The practical reason is because the direct appeal always goes first. And so not until the conclusion of the direct appeal does this 2255 block start. But if we were to rule against you here, is there any reason why your client practically could not immediately seek habeas relief? Sort of. And let me give your answer. And I've actually had this question before in argument, and I'm going to give you the same answer. The prior panel didn't do what I'd ask, and I'd ask you to reconsider. Because of Mr. Adams' limited score, he ended the fact that he's not entitled to counsel for habeas. Were this court to affirm with a suggestion to the district court that counsel be appointed for habeas, then the answer to your question would be no. There would be no practical roadblock to him raising the same issue as a 2255. But without counsel and the guarantee of counsel, there is a practical, though not legal, impediment that we, I think, all understand all too well. Thank you. Okay. No, we appreciate that. And, of course, the timing is such that we don't have a final judgment on his direct appeal at this point. So he's not at risk time-wise, but you're saying he's at risk substantively. Exactly. Right. So now we'll reset the clock, and we'll have counsel for Ms. Moda. Mr. Moda. Excuse me. Thank you, Your Honors. Ms. Julian. Yes. Thank you. My name is Andrea St. Julian, and I am counsel for the appellant Jonathan Moda. I'd first like to start out by pointing out that this is an appeal from a trial, and it was a trial where my client represented himself. And during the course of this trial, the district court made a number of evidentiary errors that really require the reversal of the conviction on appeal. So the first error was made with respect to expert witness testimony. And there were two experts that testified, and they testified about matters that were well within the bounds of the jury's ordinary experience. And for that reason, they were error. And this was error under Rule 702. The first individual to testify, expert to testify, was a correctional officer by the name of Mr. Joel. Mr. Joel essentially testified that a weapon, such as a knife, is for the purpose of cutting or penetrating. There is nothing in that testimony and the surrounding testimony to support that, that is needed to be given by an expert witness. Similarly, Dr. Moore testified. Dr. Moore was the treating physician at the facility at the time of the incident. And Dr. Moore gave lengthy testimony that essentially said nothing more than if a person gets stabbed, he or she could die. I don't think there's anything... I thought he said a little more than that because, I mean, doesn't it matter where you get stabbed? And this was a stab to the... there was a stab to the eye area that could have gone to the brain? Yeah, yeah. Wasn't that the testimony? There was some testimony to that effect. But I would double down on my original proposition in that I think that that is well within common knowledge that if you get stabbed, and it was a little more than just to the eye, it was if you get stabbed and it goes through the eye to the brain, you could die. I don't think that there is anything about that statement that is needed for an expert. Counsel, Judge Gould, if I could ask you a question, please. Please, please. Is it common knowledge? Yeah, sorry. Is it common knowledge what a homemade or prison-made shiv, what damage can be delivered by a prison-made shiv? Yes, I believe so. I would not put it in terms of a prison-made shiv, but it was presented as a six-inch instrument. It was shown to the jury. There is a reason why we don't give small children an object like this, because everybody knows that that child could do some damage to themselves or another person with that instrument. That is absolutely common knowledge. I have some sympathy for your argument that the expert went too far. We don't need necessarily expert testimony, but the question then is how do you overcome the plain error review? Yeah, well, I think it was in two ways. One, I did believe it was plain error. Two, there were a number of evidentiary errors, and looking at those errors cumulatively, those also require a reversal. So I would ask for the court to please keep in mind, as I'm making these arguments, that I also would like the court to look at them cumulatively. To me, again, clearly plain error. If the only error were letting in the testimony about basically the murderous intent, if that were the only error, would you still satisfy all the elements of plain error review? Absolutely, absolutely. The relevant rules, I think you're now moving on to talking about both Rule 702 and Rule 704 are very clear. That is very plain. Well, okay. There's an expert witness on the stand, and he's testifying about various things, and he gets to intent, and he makes these statements, and there's no objection. And then we have to find out whether this really substantially affected things. The defendant stabbed him in a certain place, and it seems to me that the testimony all adds up to, the evidence all adds up to, it would have come out the same way. They found guilty of attempted murder. Well, I would pick that apart a little bit. You said the defendant stabbed him. There were many defendants in this case, and there is no indication of how a particular wound was received by Mr. Karam. So I would demur on that part. Wasn't Mota the only one in the copy room? No. Oh, goodness, no. Outside the copy room, there were a lot of people, but wasn't Mota, wasn't he the one that was with Officer Karam in the copy room, if I got that wrong? No, there were two. There were two. Sciago? Sciago. Sciago was there, and at the time, the reports were made immediately after the incident, and also by one of the eyewitnesses. Not one of them said that Mr. Mota had a weapon at that time. Later on at the trial, all of a sudden, everybody starts saying he had a weapon. But at the time they made their original reports, everyone only said that Sciago had a weapon. So it was indeed the two of them. And, again, my time is really running out, Your Honors. So in addition to those two issues, the issue of testimony regarding the intent to kill under 704 was extremely prohibited, and it links back to the earlier testimony. They kept trying to get in statement after statement saying that it was their opinion that it was Mr. Mota's intent to kill Mr. Karam. And seeing that this was an element of the crime of an intent, it was completely prohibited. And that is really important. They had to prove intent, and they went over the line time and time again about the intent to kill. And that is really important to note of why it is hugely prejudicial in this case and really requires, and I would just like to say very, very briefly, the court clearly sentenced Mr. Mota based on his decision to go to trial. The court says it right there repeatedly. And that just requires a reversal in this case. And if my time has run out. It requires a resentencing. Yes, it requires a resentencing. All right. All right. Thank you. I hear from the United States. Thank you, Your Honor. Mr. Kirk, Sheriff for the United States, may it please the court. And I'll follow the order of the defendant's arguments and begin with Adams, unless the court has preference. No, that's fine. So the district court did not plainly err by not sua sponte imposing a self-defense instruction. That was not Adams' defense. And Adams did not argue self-defense in closing, did not even hint at it in opening, never requested a self-defense instruction. And this is a case in which every single instruction the defense requested is given. The district court under this court's precedence in Montgomery and Span 1, which while not being self-defense cases, are instructional error cases, is not required to sua sponte impose an instruction on a defense theory that was not argued at trial. In both of those cases, there was no argument at trial on that issue, and that was not found to be plain error. In one in Montgomery, the defense was that the witness had conspired only with a government agent. There was testimony that could potentially have led to that. And in Span, the same thing. There was a failure or a non-instruction on an excessive force theory, and it was clear from the court's decision in Span 1 that that argument could have been teased out, potentially, from the facts that were testified to and the evidence before the court. But there was zero argument on that, and the court found that that is not plain error when there was zero argument. That was not the defense theory at trial. Now, in Span 2, after a full development of the record on habeas, the court did find that that was the argument that should have been made, and that counsel in Span's case, trial counsel, had effectively deliberately omitted his client's only defense based on a misunderstanding of the law. But there's absolutely no basis for any such conclusion like that in this case. In this case— In this case, we have Mr. Adams chasing Officer Karam down the hall and gets involved in this melee at the end of the hall, and I take it counsel was basically trying to get him out of the conspiracy and attempted murder charge. That's correct, Your Honor. And he succeeded on both of those. He succeeded on both of the major counts, and he succeeded— and this court has noted, and I refer the court to the Swanson decision, that that is potentially a sound trial strategy, and in fact it was a sound trial strategy for the defense in this case, even if he had assumed that— or even if there had been more fulsome testimony as to self-defense. His decision to focus on the major counts and argue a mere presence defense was certainly not unsound. But he also—trial counsel was limited also by what Adams actually testified to, and he testified quite clearly that he did not recollect striking the person in front of him. That was Beardsley. He acknowledged what the video showed, but he—his whole defense was focused on a— and as it turns out wisely, given the success of the defense at trial, was focused on an attempt to minimize Adams' intentional use of force, and it would have—a self-defense instruction, arguing self-defense, would have highlighted Adams' use of force by requiring development of the fact that he intentionally used force. And I would note that Adams' testimony also does not make out a prima facie case of self-defense, and even if he'd sought such an instruction, or counsel had sought such an instruction, he would not have been entitled to one because he didn't make an offer of proof. The defense would be, I was trying to hit whoever that was to get them off of me, but I didn't know it was a police officer or enforcement person. Except he didn't testify to that. Well, that's what it would have been, the self-defense testimony, wouldn't it have been? Well, except that his counsel's constrained by what Adams actually testified to. Okay. Which is that he never claimed to have intentionally hit anyone. He never claimed that he intentionally hit the person in front of him who he didn't know but claimed, but later found out to be Beardsley. He didn't claim or testify that he meant to hit someone else and inadvertently hit Beardsley. And so that's—there's no testimony that would support that prima facie case that he had to use an immediate— He didn't testify that he was trying to—he was lashing out, which I assume means trying to get somebody off of him, trying to hit them, right? And he says, I don't know what was happening there. I was just trying to hit—I was trying to get out of this mess. Yes. He did testify that he threw some punches, doesn't recall hitting anyone, admits the video showed that he struck Beardsley. But he also can't, Your Honor, meet the second prong of the prima facie case, which is that the use of force was reasonable under the circumstances. You have—the video shows the trajectory before that, and then you have Beardsley coming in to try and rescue Karam, who's under attack from six inmates. Beardsley's knocked to the ground, just blindsided and decked by another inmate. And then Adams comes over and starts to punch him. There's no threat from Beardsley. There's no effort or anything that would be reasonable there. I will—would also say that Adams cannot show that the claimed error, instructional error, affected the outcome of the trial, even assuming that he could get there in notwithstanding this court's precedence in Montgomery in span one. You have the video of the assault. You have Adams' own testimony acknowledging that was him and that he was there, and the fact that the video shows him hitting Beardsley. You have eyewitness testimony from Beardsley and Becerra. Those were the officers, one witness and one victim. And the court considers all of those circumstances at trial, including the strength of the evidence against the defendant. Counsel? Yes. Can I ask you a question, please? How would you respond to Mr. Burstein's argument that if we rule against Adams, we should do something to encourage appointment of counsel in a habeas case? Well, that's not the standard practice of this court, and I don't think this is the case that warrants that, Your Honor, in the sense that this is not a difficult issue. If Adams were to come in, and I do not believe this is the case, but were to say that he wanted to argue self-defense and lay out— I can imagine he could lay out something that would establish— I don't believe he can actually lay that out, and I find it hard to believe and not credible, but he certainly could articulate something if he wished to, and if it were accurate, that would presumably then prompt the district court to require briefing and further development. Thank you. And I would note that the cases that Adams cited, counsel cited, and that are in the brief Sanchez-Lima and Escobar-DeBrite do not involve plain error. So in Sanchez-Lima, the defendant requested a self-defense instruction, and then based on the testimony, that should have been given. In Escobar-DeBrite, again, the defendant's testimony was sufficient to support a self-defense theory, but not testimony independent of a request for the instruction and argument on the issue potentially. They requested the self-defense instruction. It was that there isn't a requirement of corroboration testimony at trial. If the only one testifying to it is the defendant and that's the defense theory, then yes, the self-defense instruction should be given, but that was not the defense theory in this case. And I would move on at this point to the Mota case, unless the court has further questions on Adams. No. Thank you. Can you clarify for me who was in the copy room? Mota and Chiago, Your Honor. There was testimony from Karam that Mota and Chiago both came in, both had weapons, and both struck him in the copy room. He pushed Mota out at one point, and Mota came back in and continued the attack. That was before Karam ultimately was able to burst out of the copy room, thinking he was escaping. I will note on that issue that it is not true that the prior discovery and reports in the case did not refer to Mota as having weapons. That's addressed at footnote 5 of the government's answering brief. There was some discussion of an initial report by Beardsley that was done right on the spot, essentially, before he went to the hospital, Beardsley and or Karam. And subsequently, and it was very brief and it didn't have full detail, there was other reports that were done promptly within a day or two that identified the attackers and weapons, and that was testified to and the government cited to relevant portions of footnote 5 of the answering brief. In addition, at trial, there was testimony that – clear testimony from Karam that Mota had a weapon, struck him with a weapon, and then Beardsley also testified that he saw Mota strike Karam with a weapon well in the hallway. And then, of course, the DNA evidence is overwhelming linking Mota in several places on the weapon, as well as to the string that was on the weapon that was used for a grip on the weapon. I'd turn to the Rule 702 issue, which counsel addressed, and it was not plain error under Rule 702 to admit expert testimony concerning the homemade weapons. These are the homemade prison weapons. These are not items that are found outside of the prison setting and settings that are matters of general knowledge. The process – with respect to Joel's testimony first, Officer Joel's testimony, he had specialized knowledge concerning these weapons, was familiar with how they were made commonly, and had seen numerous such weapons. The process for making those homemade weapons, the nature of the metal tip, which is not necessarily obvious on the exhibits – and I believe it's at SCR 3, the photo of one of them – and how they're rolled and the metal tip is inserted in there so that you can have the sharp tip. But he goes further than that. Well, he does. I mean, all that is legitimate kind of expert knowledge that maybe people outside the prison setting don't know how they roll them up and all that, what they're used for, that they're common. But then he kind of goes one step too far, doesn't he, in terms of what he's intending? Well, in terms of the weapon – so he – and there are several instances where there's somewhat of a nonresponsive addition onto the question. So the question is how the weapon is made. He describes that, and he adds that the purpose of the tip is to penetrate clothing and to penetrate skin. Yes. But it's not necessarily obvious from – it's not akin to saying that the sharp edge of a blade, of a kitchen knife, is for cutting. This is an object that if you were to look at it just on the photograph, as the jury was seeing it during the trial, or through a plastic bag held up at a distance, it's not obvious that there even is a tip on there or what the tip would – how it's – how it is –  So I think that given the unique nature of the pro-Ahmad weapons, that was not a 702 issue. I would note with respect to the doctor that his testimony, again, was not – it was not that it simply – that if a person gets stabbed, he or she could die. It was – he linked the weapons, essentially, or similar such weapons, to Karam's injuries, the victim's injuries, and testified to their capacity to do harm, that Karam's injuries were consistent with the type that could be inflicted by weapons recovered at the scene, and that the puncture wound had – near Karam's eye had been a centimeter or two, two centimeters, I believe, closer to the eye socket center. It could have penetrated the eye socket and caused neurological damages or death. That is the type of medical expert testimony that's consistent with this court's decisions, or at least the analysis in Smith and Urena. Urena specifically held that a doctor's testimony on the causation of a victim's injuries is expert testimony, and that's exactly what he testified to here. And I would note that in Smith it is – it's true it's not a 702 ruling, but there was an instructional error in the case, and the court analyzed whether it was harmless because of the overwhelming evidence that the weapon was dangerous, and in doing so it relied at length in the en banc decision in Smith that – on a physician's assistant's testimony that the weapon did cause injuries, it's a prison weapon in prison, and it could have caused fatal injuries. That's – it's hard to see how it could be plain error for the district judge to not have allowed that with no objection when that's precisely the type of testimony that the court relied on in the en banc Smith decision to affirm the verdict below. And there's really no question as to Dr. Boer's qualifications. I would like to address the 704B issue briefly, which was not addressed extensively in the opening argument. Joel's expert testimony was primarily concerned with evidence of coordination by the inmates and not intent. Now, MOTA on appeal now challenges a handful of statements by Joel, some add-ons to answers. I'd note those statements did not refer specifically to MOTA. None of the statements were objected to. Some were elicited by MOTA on cross-examination. And this court, for example, in Reyes-Alvarado, has noted that the defendant cannot claim error for statements he elicited. And some statements also do not clearly implicate Rule 704B, the fact that using multiple weapons in an assault might inflict severe damage, for example. That does not compel a conclusion that MOTA had a specific intent to kill. And I would note that under the Morales decision, Rule 704B does not preclude expert testimony from which the jury might infer that MOTA did or did not possess the requisite mens rea, only opinions or inferences under which it would compel the conclusion that he had the specific intent. Okay, so there is the sentence, that is trying to murder somebody. Yes. Right on point with the intents needed. Your argument is that, well, that's not directed to MOTA particularly? I'm not going to stop. I'm not going to just say that, Your Honor. I think that that is problematic under 704B. And had an objection been made to those add-on sentences, again, it was sort of an add-on to the answer, that objection may well have been sustained. But the relevant aspect to that statement is that that was clearly talking about coordination by six attackers. And like most of the statements, actually all of them, none of them refer specifically to MOTA. And it clearly referred to, and his testimony was in the context of the conspiracy and the coordination, but MOTA was acquitted of the conspiracy charge. And the testimony of the expert on all of these points would have applied equally to Adams as well as to MOTA. And Mr. Adams was acquitted on the conspiracy and on the attempt to kill. So it's clear that the jury was not overborn or that any risk of undue prejudice from that one statement, that sentence or two on that one answer did not affect the jury. I think we have your argument in mind, but you're running out of time, and I do want to ask you about the sentencing. Okay. Because initially the judge said that, was distinguishing Mr. MOTA from the other defendants, said that he had testified, he'd perjured himself, and then the government stepped in and says, no, no, he didn't testify and gently was saying it was Adams, you know, not MOTA. And then he goes on and gives him a within-guideline sentence, and although I recognize there's deference and reasonableness, he starts out with a different mindset, and he then talks about, of course, this defendant should be distinguished from the others. So my question is whether, given that backdrop, a resentencing would be in order. I don't think so, Your Honor. It's quite clear that he misspoke with respect to MOTA having testified instead of Adams. That was corrected. He clearly corrected it. He himself said, no, it was Adams that testified. And you have a situation in which MOTA was differently situated from the co-defendants because the co-defendants, Chiago and the others, had accepted responsibility. They were also sentenced to aggravated assault, a lesser offense. And just focusing on this argument that the district court held somehow held a trial against MOTA, that's not what the record shows. The record shows that the court was focused on the acceptance of responsibility. He said, do you understand there's no equality here with regard to your co-defendants except possibly Mr. Adams, and that's because they accepted responsibility. You did not. And he says yes. Yes. And he says there's a substantial difference when you don't accept responsibility. And then the court could have said that's a big difference between you and the co-defendants who pleaded or, I mean, who accepted responsibility. He said that it was almost a reference to them when he says that that's a big difference between you and the co-defendants that did not go to trial. That's simply a way of describing the ones who had pleaded and accepted responsibility. He's not ever saying that he's holding anything against MOTA for having gone to trial. This is very, very far from the Medina Cervantes decision, where the district court noted all of the costs that the defendant had incurred on the court, the court had incurred by virtue of the trial, and then imposed a fine on the defendant to reimburse the government for the cost of going to jury trial. Thank you. Yeah. Thank you, Your Honor. Do we have a rebuttal, Mr. Bernstein? There we go. Thank you very much, Your Honor. Three quick points, hopefully. Number one, my colleague makes a lot in both his arguments and his briefs about the fact that self-defense wasn't argued in closing. It's a red herring, and it's a red herring for two reasons. First of all, as a factual matter, in this case, the judge pre-instructed. In other words, he gave all of the jury instructions before closing arguments. So whatever was said in closing arguments is obviously irrelevant to the instructions that were given before. But second of all, leaving that to the side, the standard under this court's case law is clear. It's is there a factual predicate in the evidence? If there is, you get the instruction as a matter of law. And we all know closing arguments are not evidence. Therefore, what's argued in them can't be the standard as to whether or not you get the instruction. Second point, we've heard a lot about chasing. Mr. Adams chased the officer down the hall. I understand that interpretation of the video, but it is contrary to Mr. Adams' direct testimony that he was knocked over and dragged down the hall. We believe the jury credited that testimony. It's at ER 954 and 955, and I would ask the court perhaps to look at that in the context of the jury's acquittals. The last legal point is we've talked a little bit about the Bair case, but do you think the Anderson case, do you think that is our best case? If you take the word self-defense and substitute it for excessive force, I think the Anderson case, repeatedly cited in the briefs, is our best case. Final point, and this goes to appointment of counsel. Assuming, you know, for the sake of this hypothetical, the court doesn't agree on the point there. We've asked for some indication that the district court should appoint counsel. Appointment of counsel under the Criminal Justice Act is between the court, this court or the district court, and the defendant. In a prior opinion, this court has advised the government when it comes to the Criminal Justice Act it should mind its own business. It's a decision between the court and the defendant. If this court thinks that there is a potentially viable 2255, given what we know about Mr. Adams and his lack of education, I would respectfully urge the court to at least drop some sort of footnote suggesting politely to the district court that appointments of counsel is necessary, if the court doesn't want to go ahead and order it, which I can understand, but at least something on behalf of Mr. Adams. Thank you, Your Honor. Thank you. Ms. St. Julian? Thank you, Your Honors. I'd first like to just briefly address the evidentiary issues. I did briefly discuss the intent to kill issues as well as the experts testifying about issues that are within the bounds of common reason. I would like to just remind the court that in addition to those two, I have also raised, or Mr. Mota has also raised, the problem with the shackling issue and also with allowing in photos of him shirtless. In terms of the latter, the shirtless, the prosecution wanted to identify Mr. Mota, his face and his neck. And instead of just putting in a headshot, they put in a picture of him shirtless. And Mr. Mota just asked, you know, have them identify my face with me here. Have them get another picture or just crop the picture that you've got of me shirtless. But the court out of hand refused to do that. And that was an additional error that cumulatively is a problem. You know, it may have been not as civilized as it should have been, but where was the prejudice? I didn't see anything in the tattoos that, there were a lot of tattoos, but they didn't say anything in particular or have a gang or something like that. A half-shirted, half-naked man with tattoos all over screams dangerousness. I see. And that in and of itself is extremely prejudicial when you're talking about intent to kill. And the same is true of shackling. He was shackled and the government goes on at length about why it was okay to shackle Mr. Mota. Although Mr. Mota didn't agree with the shackling, that's not what we raised on appeal. What we raised was the fact that Mr. Mota was required to be seated and he just wanted all the other counsel to be seated as well. And I think there was reasons about why other counsel needed to do things with exhibits and etc. Well, so did Mr. Mota. Mr. Mota needed to do things with exhibits as well. And he would hand them to them and they did what they needed to do. And that process could have been done with everybody. I see. And that would have taken care of the whole problem and the whole issue there. If I could just say Smith or Rayna cases in Morales are completely inapposite. They do not address the issues that have been raised. And then finally, I would just like to also say with respect to the record issue and the weapon, I will leave that to the court to read the record as we've pointed out in our briefing. But also I'd like to point out that the DNA evidence in this case is absolutely useless. Because the materials, the weapons were handled so poorly as admitted by everyone involved. The weapons were mixed together. They had slid across rooms. Other people had touched them. They had been piled together with other clothes. The DNA does prove that there is something on a particular item. It doesn't prove how it got there. Thank you. And that's certainly true in this case. Thank you, Your Honor. I'd like to thank all counsel for the argument this morning. The cases of United States versus Adams and Mota are submitted and were adjourned for the afternoon. All rise.
judges: McKEOWN, GOULD, Restani